IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JAMIE SOTO, ) | |
| ) | CASE NO. 1:13-CV-2593 |
| Plaintiff, ) | |
| v. ) | |
| ) | MAGISTRATE JUDGE |
| ) | KENNETH S. McHARGH |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY ADMINISTRATION, ) | **MEMORANDUM OPINION &** |
| ) | **ORDER** |
| Defendant. ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 14). The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Jamie Soto's ("Plaintiff" or "Soto") application for a Period of Disability and Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision.

## I.  PROCEDURAL HISTORY

Soto filed an application for a Period of Disability and Disability Insurance benefits on July 19, 2005. (Tr. 30, 84-86). Plaintiff alleged she became disabled on July 15, 2002, due to chronic fatigue and infections, fibromyalgia, depression, ulcers, colitis, and immune deficiency. (Tr. 30, 77). On March 27, 2006, the Disability Determination Service ("DDS")[1] approved Plaintiff's claim for benefits, but with a disability onset date of January 23, 2006, the date on

---

[1] Most Social Security disability claims are initially processed through a network of local Social Security Administration field offices and State agencies, which are usually called Disability Determination Services or DDSs. Subsequent appeals of unfavorable determinations may be decided in a DDS or by an administrative law judge in SSA's Office of Disability Adjudication and Review. *See* http://www.ssa.gov/disability/determination.htm.

which Plaintiff underwent a consultative psychological examination with Mitchell Wax, Ph.D. (*Id.*). The DDS found that prior to that date, there was no evidence suggesting any impairments with Plaintiff's ability to carry on regular activities. (Tr. 77). Soto requested reconsideration of her established onset date. (Tr. 68, 73, 76). On October 13, 2006, the DDS affirmed its prior determination of an onset date of January 23, 2006. (Tr. 68).

On November 29, 2006, Plaintiff filed a request for a hearing by an administrative law judge ("ALJ"). (Tr. 67). Prior to the hearing, in April 2008, disability examiner Kathy Davis reviewed the record apparently to determine if an earlier onset date could be established without the need for an administrative hearing. (Tr. 49). She noted that Plaintiff's counsel had submitted a number of additional medical records showing that Plaintiff received treatment for a variety of physical symptoms in the past. (*Id.*). The examiner concluded that in regard to Plaintiff's alleged onset date, "it seems unlikely that her psychological symptoms became disabling on the date of the consultative exam and an earlier onset is likely. However, it is difficult to establish onset as of her [alleged onset date] of 7/15/02. A fully favorable onset cannot be established and [the] case is being returned for [the] ALJ to determine onset." (*Id.*).

ALJ Steven Hanekamp convened an administrative hearing on September 5, 2008, to evaluate Soto's application. (Tr. 774-810). Plaintiff, represented by counsel, appeared and testified before the ALJ. (*Id*). A vocational expert ("VE"), Gene Burkhammer, also appeared and testified. (*Id.*). During the hearing, the ALJ explained that he was required to make a fresh determination regarding whether Plaintiff was disabled, and could not limit the issue to the appropriateness of an earlier onset date. (Tr. 777-78). Soto's counsel agreed and communicated his client's understanding. (*Id.*).

On October 30, 2008, the ALJ issued an unfavorable decision, finding Soto was not disabled at any time from July 15, 2002, through the date last insured. (Tr. 30-45, 36, 778). After applying the five-step sequential analysis,[2] the ALJ determined Plaintiff retained the ability to perform work existing in significant numbers in the national economy. (*Id*.). Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. (Tr. 26). The Appeals Council denied the request for review, making the ALJ's October 30, 2008 determination the final decision of the Commissioner. (Tr. 2-4, 18-20). Plaintiff now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 1383(c)(3).

---

[2] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability." *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1) If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2) If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3) If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4) If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5) Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

## II. EVIDENCE

### A. Personal Background Information

Plaintiff was born on January 18, 1965, and was 42 years old on the date last insured and 43 years old at the time of the administrative hearing. (Tr. 43, 782). As a result, Plaintiff was considered "a younger individual" for Social Security purposes. 20 C.F.R. § 404.1563(c). Plaintiff completed high school. (Tr. 579). She has past work as a bank teller, assistant bank manager, and bank manager. (Tr. 806).

### B. Medical Evidence[3]

In 1999, three years prior to her alleged disability onset date of July 15, 2002, Plaintiff treated with Olga Kovacevic, M.D., after having received diagnoses of chronic fatigue and mild situational depression from physicians at the Cleveland Clinic. (Tr. 683-84). Around the beginning of September 1999, Dr. Kovacevic prescribed 40 mg of Celexa. (Tr. 682-83). By October 27, 1999, Plaintiff reported she was doing well on Celexa, feeling more energetic and alert. (Tr. 681). Dr. Kovacevic's progress note from January 2002 indicated that Plaintiff continued taking the same dosage of Celexa. (Tr. 674).

During the year-and-one-half after her alleged onset date, Plaintiff visited Dr. Kovacevic and other physicians on a number of occasions. (Tr. 662-73). Treatment notes from this period do not discuss Plaintiff's depression. (*Id.*). Soto did not otherwise seek psychiatric treatment. As of March 20, 2003, Plaintiff was still taking 40 mg of Celexa daily. (Tr. 667).

A number of years later, on January 23, 2006, Plaintiff underwent a one-time consultative psychological examination with Mitchell Wax, Ph.D. (Tr. 579-84). At the time of the

---

[3] The following recital of Plaintiff's medical record is an overview of the medical evidence pertinent to Plaintiff's appeal. It is not intended to reflect all of the medical evidence of record. Plaintiff challenged only the ALJ's evaluation of her mental impairments, therefore, the Court's discussion is limited to that portion of the medical record.

4

examination, Plaintiff had no prior psychiatric hospitalizations or prior psychiatric care, and was not currently undergoing counseling. (Tr. 580). Dr. Wax diagnosed major depression (severe with psychosis) and post-traumatic stress disorder ("PTSD") as a result of being a victim in a bank robbery in 1994. (Tr. 583). He assigned a Global Assessment of Functioning ("GAF") score of 30, representing behavior that is considerably influenced by delusions or hallucinations, serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupations), or an inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends). (*Id.*). Dr. Wax based the GAF score on Plaintiff's self-reports, which Dr. Wax felt demonstrated that she acted in a "grossly inappropriate manner." Soto told Dr. Wax that she was tired all the time, stayed in bed most of the day, could not work, had no friends, and was totally taken care of by her husband, mother-in-law, and sister. (*Id.*).

As to Plaintiff's functional limitations, Dr. Wax opined that Plaintiff did not have sufficient judgment or reasoning ability, and could not concentrate well enough to live independently. (Tr. 582). Soto could marginally make important decisions concerning her future and could not manage her own funds. (*Id.*). The psychologist concluded Plaintiff's abilities were significantly impaired in the following areas: relating to others; understanding, remembering, and following instructions; maintaining attention, concentration, and persistence; and withstanding stresses and pressures associated with day-to-day work. (Tr. 582-83).

On February 17, 2006, Andrea Mann, D.O., indicated that Plaintiff's depression was poorly controlled on Celexa and Wellbutrin. (Tr. 400). The doctor recommended trying Cymbalta, continuing Wellbutrin, and following up in three weeks. (Tr. 403). Plaintiff's next visit, however, was not until approximately four months later, on June 23, 2006. (Tr. 396). Treatment notes included no mention of issues with depression. (Tr. 396-99).

5

On February 24, 2006, state agency reviewing physician Leslie Rudy, Ph.D., conducted a review of Soto's file. (Tr. 5523-55).  In the checkbox portion of the Mental Residual Functional Capacity Assessment form, the doctor indicated that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions, and respond appropriately to changes in the work setting. (Tr. 552-53).  Dr. Rudy also opined that Plaintiff was markedly limited in her ability perform activities within a schedule, maintain regular attendance, be punctual, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without unreasonable number and length of rest periods. (*Id.*).

In her narrative discussion, Dr. Rudy questioned Dr. Wax's opinion on several grounds:

> [Dr. Wax] provided diagnoses of Major Depression, severe, with psychosis and PTSD.  There are no allegations or documentation of signs and symptoms in support of the PTSD diagnosis.  There is also no support for the diagnosis of psychotic symptoms associated with the mood disorder.  [Plaintiff] was noted to arrive on time (transported by husband), relate well to the examiner, complain frequently about physical symptoms and was often vague and circumstantial.  [Dr. Wax] observed that [Plaintiff] appeared preoccupied and was very involved with her medical problems.  [Plaintiff] recalled 6 digits forward and 4 reversed, recalled 2 or 3 after delay, and was able to count by 3s and completed serial 7 subtractions.  [Dr. Wax] concludes significant impairment in social interactions despite the [Plaintiff's] report of getting along adequately with family and interacting appropriately during the exam.  [Dr. Wax] also concludes significant impairments in her ability to understand/remember/carry out instructions, despite his estimation of her intellectual functioning in the Average range and her adequate performance on MSE tasks.  [Dr. Wax] also concludes significant limitations in attention/concentration and stress tolerance, but these conclusions appear to be based on [Plaintiff's] symptom report and physical symptoms as opposed to findings from the examination.  The conclusions are not consistent with the findings documented in the report and are therefore not given weight.

(Tr. 554-55).  Nevertheless, Dr. Rudy opined that Plaintiff would be unable to work, explaining:

> Due to [Plaintiff's] intense preoccupation with somatic symptoms, for which she has sought numerous treatments and which have resulted in significant life-alterations, she would be unable to sustain regular attendance at a level that would be tolerated in a typical work-place environment.  She denies that such symptoms

6

> are psychologically based, but evidence in file indicates that [Plaintiff's] impairments meet criteria for a Somataform disorder diagnosis.
>
> There is insufficient evidence from the [alleged onset date] to the date of filing to make the psych portion of the disability determination.

(Tr. 555). On February 28, 2006, Dr. Rudy clarified that there was insufficient evidence to make the psychological portion of the disability determination from the alleged onset date of July 15, 2002, through January 22, 2006, the day before Dr. Wax's consultative examination. (Tr. 550). The doctor indicated that as of January 23, 2006, Plaintiff did not have the ability sustain attendance at a level that would be tolerated in a typical workplace due to symptoms of somatoform disorder. (*Id.*).

On March 23, 2006, state agency physician, Joseph Cools, Psy.D., evaluated the record and agreed with the DDS's established onset date. (Tr. 540). He opined that Plaintiff would be incapable of performing simple routine tasks with adequate pace or endurance and would be unable to tolerate normal stress. (*Id.*).

On October 3, 2006, state agency physician Todd Finnerty, Psy.D., reviewed the evidence and Dr. Rudy's February 24, 2006, assessment. (Tr. 394). Dr. Finnerty affirmed the unfavorable onset date of January 23, 2006. (*Id.*).

Soto attended a psychiatric evaluation at the Cleveland Clinic with Jerilyn Hagan Sowell, MSN, CS, on May 8, 2007. (Tr. 146-50). At the time of the evaluation, Plaintiff was taking Cymbalta and Wellbutrin, but had never undergone psychiatric therapy. (Tr. 146). Soto denied symptoms of anxiety, but described sleep disturbance, decreased interest, and hopelessness with passive thoughts of death or suicide, but no intent or plan. She also denied any manic episodes and PTSD symptoms. (*Id.*).

7

Upon mental status examination, Ms. Sowell described Plaintiff as neat, clean, and appropriately dressed. (Tr. 147). Soto was cooperative with the interview, maintained good eye contact, and was alert and oriented. Plaintiff's speech was normal in rate, tone, and volume; her thought content was logical and goal-directed. Plaintiff exhibited psychomotor retardation and described her mood as "I hate life." However, her affect was appropriate and responsive, and there was no evidence of disturbance in thought perception or progression. Soto's memory was fair, and she was able to recall 3 out of 3 objects after 5 minutes. Plaintiff's concentration was good, as she was able to calculate "serial 7s," and her abstract reasoning was good. Her insight and judgment were adequate. Lillian Gonsalves, M.D., discussed the results of the examination with Ms. Sowell and diagnosed mood disorder and major depressive disorder, severe with psychotic symptoms. Dr. Gonsalves assigned a GAF score range of 42-50-41, representing serious symptoms (e.g., suicidal ideation) or any serious impairment in social or occupational functioning (e.g., no friends, unable to keep a job). Dr. Gonsalves did not change Plaintiff's current psychotropic medication regime and recommended pain management. (*Id.*).

On September 26, 2007, Edward Covington, M.D., evaluated Soto at a pain management center. (Tr. 137-41). Plaintiff had multiple complaints of pain throughout her body, but told Dr. Covington that she felt the chronic pain program may not be possible due to her schedule with her children, who were 12 and 5 years old. (Tr. 137). Nevertheless, Plaintiff reported that her social, work in the home, and recreational activities were severely impaired, and she reclined 16 hours out of the day. (Tr. 138). She recounted a history of various encounters with physicians and her frustration with medical providers' inability to discover what was causing her problems, which included fatigue, pain, and weakness. (*Id.*). Plaintiff reported symptoms of sadness, depression, loss of interest and energy, and feelings of worthlessness and hopelessness. She had

8

a "don't care attitude," and her objective was to "get through the day and take care of my children." (*Id.*).

Based on a mental status examination, Dr. Covington described Soto as alert, cooperative, and pleasant. (Tr. 139). Her eye contact was good, though her affect was depressed. Soto's speech was spontaneous, fluent, and coherent; her thoughts were logical without any delusional thinking or hallucinations; her judgment and insight were good; her attention and concentration were normal; and she was well-oriented. (*Id.*). Dr. Covington recommended daily treatment in the chronic pain rehabilitation program for approximately three weeks with goals of pain reduction, functional restoration, mood normalization, improved coping, and vocational rehabilitation. (Tr. 140). The doctor felt that Plaintiff's prognosis was good. (*Id.*).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirement of the Social Security Act on December 31, 2007.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 23, 2006, through her date last insured of December 31, 2007.

3. Through the date last insured, the claimant had the following severe impairments: depression; complaints of fatigue variously diagnosed as Lyme disease versus fibromyalgia versus chronic fatigue syndrome; history of acute pyelonephritis, viral gastroenteritis, systemic fungal infection, mild ulcerative colitis, and transient ischemic attack; anemia; and hypothyroidism.

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except that she is limited to simple routine tasks and superficial interaction with co-workers, supervisors, and the general public.

6. Through the date last insured, the claimant was unable to perform any past relevant work.

9

7. The claimant was born on January 18, 1965, and was 42 years old, which is defined as a younger individual age 18-49, on the date last insured.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not an issue because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

11. The claimant has not been under a disability, as defined in the Social Security Act, at any time from January 23, 2006, the alleged onset date, through December 31, 2007, the date last insured.

(Tr. 32-45) (internal citations omitted).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20 C.F.R. §§ 404.1505, 416.905.

## V. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

"Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI. ANALYSIS

Plaintiff takes issue with the ALJ's treatment of opinions issued by state agency reviewing psychologists Drs. Rudy, Cools, and Finnerty. In February 2006, Dr. Rudy opined that Plaintiff did not have the ability to sustain attendance at a level that would be tolerated in a typical workplace as of January 23, 2006. (Tr. 550). During March 2006, Dr. Cools concluded that Soto would be incapable of performing simple routine tasks with adequate pace or endurance, and would be unable to tolerate normal stress, as of January 23, 2006. (Tr. 540). Finally, in October 2006, Dr. Finnerty reviewed the evidence and affirmed the unfavorable onset date of January 23, 2006. (Tr. 394). Plaintiff asserts that the ALJ failed to name these

11

psychologists in his opinion and any analysis provided is insufficient to meet the requirements set out in Social Security Ruling 96-8p and 20 C.F.R. § 404.1527.

It is well-established that for an ALJ's decision to stand, the ALJ is not required to discuss every piece of evidence in the record.  *See, e.g.*, *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  Nevertheless, if the opinion of a medical source contradicts the RFC finding, an ALJ must explain why he did not include its limitations in the determination of the RFC.  *See, e.g.*, *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.").  Social Security Ruling 96-8p explains, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).  Additionally, the regulations instruct the ALJ to consider the opinions of state agency psychological consultants, given their medical qualifications and familiarity with social security disability evaluation.  20 C.F.R. § 404.1527(e)(2)(i).  When a treating source's opinion is not given controlling weight, the ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist." 20 C.F.R. § 404.1527(e)(2)(ii).

In the present case, Plaintiff correctly argues that the ALJ did not name the three state agency reviewing psychologists or indicate the weight assigned to their opinions.  The ALJ provided the following discussion regarding opinions from the Disability Determination Service ("DDS"):

> Since the DDS found the claimant disabled due to the results of a consultative psychological evaluation (CE), the claimant's mental impairment is evaluated first. At the outset of the hearing, counsel argued that the claimant has a strong case for an earlier onset because (a non-medical, lay official) from the DDS stated, "it seems unlikely that her psychological symptoms became disabling [on] the date of the consultative exam and an earlier onset is likely." Exhibit 4A. However, counsel did not articulate what earlier onset date should be found or what specific medical evidence would support it. Moreover, in the very next sentence of Exhibit 4A, DDS stated that there is no evidence establishing an onset date prior to the date of the consultative examination, and my review of the evidence confirms that observation. Consequently, the DDS was correct in finding that the claimant was not disabled on her alleged onset date. *However, after considering the testimony and thoroughly reviewing the entire record, a lot of which the DDS did not have an opportunity to review, I have no choice but to conclude that the degree of mental impairment the claimant exhibited at the CE did not exist either prior to the CE, or for any significant period after the CE either, so the DDS erred in finding that the claimant became disabled on the date of the CE.*

(Tr. 36) (emphasis added). Toward the beginning of this discussion the ALJ focused on disability examiner Kathy Davis's April 2008 finding regarding Plaintiff's alleged onset date. (Tr. 49). Yet, it is unclear who the ALJ referred to as he continued to discuss the "DDS" in the italicized portion of the above quoted passage. The ALJ may have intended to reference any, or a combination of, the following findings issued by state entities: Davis's opinion (Tr. 49), the March 2006 decision approving Plaintiff's application for benefits as of the date of the CE (Tr. 77), or the three state agency reviewing psychologists' conclusions that Plaintiff was disabled as of the date of the CE. (Tr. 394, 540, 550).

Despite this lack of clarity, and the ALJ's failure to strictly comply with the applicable ruling and regulation, the Court finds any error that may exist involving the reviewing psychologists is not reversible. Reviewing physicians' opinions are due, if anything, less deference than treating physicians' opinions, and thus the same standards may be applied. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Generally, where the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight

given a treating physician's opinion, strict compliance with procedural requirements for addressing treating sources may be excused and deemed harmless.[4] *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010). Under the circumstances of the present case, the Court finds that the ALJ's decision provides adequate insight as to why Drs. Rudy, Cools, and Finnerty's opinions, which found Plaintiff significantly limited by her mental impairments, were not incorporated into the RFC.

To begin, throughout his analysis of Plaintiff's mental RFC, the ALJ discussed a number of factors that were inconsistent with the reviewing psychologists' findings of disabling limitations, as well as, a finding of disability any time during the period which Plaintiff claims mental impairments rendered her disabled. For instance, the ALJ explained:

- Plaintiff was prescribed Celexa for depression in the years prior to the relevant period while she was still a bank employee. (Tr. 37, 682). For a number of years, and into the relevant period, her prescription remained unchanged and she was not prescribed additional psychotropic medication. (Tr. 37, 667).

- During Plaintiff's general medical appointments from October 2002 through December 2003, treatment notes did not mention depression nor was there any indication that Plaintiff otherwise received mental health treatment. (Tr. 37, 662-73).

- Dr. Wax supported his diagnoses and GAF scores primarily on Plaintiff's subjective reports, rather than clinical signs. (Tr. 37). Moreover, the record shows that the severity of symptoms and signs Dr. Wax described were not present any time before his examination or any significant period after. For instance, prior to the CE, medical providers did not note any missed appointments, tearfulness, weight changes, or abnormalities of thought. Nor did medical providers consider Soto's presentation warranted referral for specialized mental health treatment. Plaintiff did not seek mental health treatment on her own initiative and was not under psychiatric care at the time of the CE. (*Id.*).

---

[4] The Sixth Circuit has also held that where an ALJ's decision is otherwise supported by substantial evidence, the failure to mention a consultative, non-treating source did not constitute reversible error. *See, e.g., Dykes v. Barnhart*, 112 F. App'x 463, 467-69 (6th Cir. 2004) (failure to expressly reject portion of consultative examiner's opinion was harmless error).

- A few weeks after Dr. Wax's January 2006 CE, Plaintiff's general medical sources observed, for the first and only time after Plaintiff's alleged onset date, that Plaintiff's depression was poorly controlled. (Tr. 38, 400). At this February 2006 appointment, Dr. Mann recommended Cymbalta and Wellbutrin and following up in three weeks. (*Id.*). Plaintiff did not follow up for another four months, at which time there was no mention of issues with depression from Plaintiff or her physician. (Tr. 38, 396-99). The ALJ reasonably concluded that based on this sequence of events, Soto's mental impairments were uncontrolled only during the short period of time from January 2006 to February 2006. (Tr. 38).

- Over a year after Dr. Wax's CE, Plaintiff attended a psychiatric evaluation. (Tr. 38, 146). While Plaintiff exhibited psychomotor retardation, clinical signs on the mental status examination were otherwise generally normal. (Tr. 38, 147). For instance, Plaintiff was neat, clean, and appropriately dressed; cooperative and maintained good eye contact; her speech was normal in rate, tone, and volume; the content of her speech was logical and goal-directed; her affect was responsive and appropriate; her concentration was good; her memory was fair. The psychologist did not change Plaintiff's prescription of Cymbalta and Wellbutrin. The psychologist recommended pain management, rather than further psychiatric care. (*Id.*).

- During a subsequent pain management examination, Plaintiff's mental status was again generally unremarkable. (Tr. 39, 139). Soto's affect was depressed and somatic preoccupation was presented, but she was alert, with logical thoughts, good eye contact, no suicidality, good judgment and insight, and normal attention span and concentration. (*Id.*). Although Plaintiff was instructed to continue pain management, she never followed up, which was inconsistent with the degree of symptoms Plaintiff claims she experienced. (Tr. 38). Plaintiff indicated hesitation to continue pain management because of her schedule with her children. (*Id.*).

The ALJ's decision, as recounted above, highlights that Plaintiff did not undergo significant mental health treatment at any point in the record: she was not referred to and never attended mental health therapy, was never hospitalized, and her prescriptions for psychotropic medications remained relatively stable and apparently helped manage her depression. Additionally, Plaintiff chose not to pursue pain management. Following Dr. Wax's consultative examination, the results of two mental status examinations revealed largely normal findings and demonstrated Plaintiff's logical thinking and coherent speech, good judgment and insight, and normal attention and concentration. The evidence discussed by the ALJ undermines the serious

15

limitations recommended by the state agency psychologists, such as Dr. Rudy's conclusion that Plaintiff could not maintain attendance and Dr. Cools' conclusion that Plaintiff could not maintain pace or tolerate normal stress due to her mental impairments.

Additionally, the ALJ questioned the probative value of evaluators' opinions regarding disability when they lack access to the complete medical record. (Tr. 36).  The three reviewing psychologists conducted their reviews toward the beginning of 2006.  As a result, none assessed the record which developed until the ALJ rendered his opinion in October 2008.  Although there is not a significant amount of evidence relating to Plaintiff's mental health, the majority of such evidence developed after the state agency psychologists' formulated their opinions, which were based on a only few notes from Soto's general physicians and Dr. Wax's CE report.  Importantly, these psychologists did not review the results of Soto's later mental status examinations, which revealed largely normal mental functioning and generally unremarkable symptoms.

Overall, the ALJ's mental residual capacity functioning is supported by substantial evidence.  While physicians may opine about the claimant's ability to work, the ultimate responsibility for determining the claimant's RFC lies with the ALJ. *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009); 20 C.F.R. § 404.1527(d)(2).  The ALJ appropriately considered and weighed the evidence, despite any oversight that may have occurred with the state agency reviewing psychologists.

Plaintiff alleges that the RFC is flawed because it was based on no medical source opinion and cites *Kizys v. Comm'r of Soc. Sec.*, No. 3:10-CV-25, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011) in support of this proposition.  In *Kizys*, the Court explained its prior holding set forth in *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 911 (N.D. Ohio Mar. 31, 2008):

> *Deskin* sets out a narrow rule that does not constitute a bright-line test. It potentially applies only when an ALJ makes a finding of work-related limitations based on no medical source opinion or an outdated source opinion that does not include consideration of a critical body of objective medical evidence. The ALJ retains discretion to impose work-related limitations without a proper source opinion where "the medical evidence shows "relatively little physical impairment" and an ALJ "can render a commonsense judgment about functional capacity."

*Kizys*, 2011 WL 5024866, at *2 (footnotes omitted).  Here, the Court finds that the record reveals relatively little mental impairment during the relevant period, such that the ALJ was able to render a judgment regarding Plaintiff's RFC based on treatment notes and testimony.  As the ALJ articulated, the record reflects that there was only a short period, from January to February 2006, during which Plaintiff's mental impairments were arguably uncontrolled. (Tr. 38). Otherwise, aside from this period of time, which included Dr. Wax's opinion, the record does not evidence more than relatively little mental impairment.

Plaintiff argues that her GAF scores were indicative of very severe mental impairments such that the ALJ could not have formulated the RFC without further medical opinion evidence. Soto asserts that Dr. Wax assigned a GAF score of 30, while Dr. Gonsalves assigned a GAF of 42. (Tr. 148, 583).  However, as the ALJ explained, Dr. Wax's GAF score was largely based on Plaintiff's subjective complaints rather than objective medical findings. (Tr. 37, 583). As to Dr. Gonsalves, the ALJ correctly observed the doctor did not indicate what point in time the GAF reflected Plaintiff's functioning or whether the GAF would permanently remain at this level. (Tr. 38, 148).  Further, despite assigning a GAF score that represented serious mental health issues, Dr. Gonsalves did not recommend psychiatric care, but only pain management. (*Id.*).  Both Drs. Wax and Gonsalves's GAFs are largely incongruent with the remainder of the medical evidence, which does not support such extreme functional impairment. Additionally, the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM") no longer

17

includes the GAF score. *Davis v. Commissioner*, No. 1:13-CV-1556, 2014 WL 4182737, at *8 (N.D. Ohio Aug. 21, 2014). The American Psychiatric Association has explained, "[c]linician-researchers . . . have conceptualized [the] need for treatment as based on diagnosis, severity of symptoms and diagnosis, dangerousness to self or others, and disability in social and self-care spheres. We do not believe that a single score from a global assessment, such as the GAF, conveys information to adequately assess each of these components, which are likely to vary over time." *Judy v. Colvin*, No. 3:13-CV-00257, 2014 WL 1599562, at *3 n.3 (S.D. Ohio Apr. 21, 2014) *report and recommendation adopted*, No. 3:13-CV-00257, 2014 WL 1900614 (S.D. Ohio May 9, 2014) (*quoting* "FAQs About DSM-5 Implementation For Clinicians," http://www.dsm5.org). As a result, courts have further questioned the usefulness of GAF scores. *Id.* Accordingly, Plaintiff's GAF scores are insufficient to demonstrate that the ALJ's mental RFC determination was inappropriate under the circumstances. Consequently, Plaintiff's allegations of error are not well-taken.

## VII. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence. Accordingly, the final decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

s/ Kenneth S. McHargh<br>
Kenneth S. McHargh<br>
United States Magistrate Judge

Date: February 13, 2015.